UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA

                -against-                          Docket No. CR 16-540

EDWARD MANGANO
LINDA MANGANO and
JOHN VENDITTO,

                Defendants.
-------------------------------------------------------------X

REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF EDWARD MANGANO'S OMNIBUS MOTION FOR RELIEF

                                      Kevin J. Keating, Esq.
                                      *Counsel for Edward Mangano*
                                      666 Old Country Road, Suite 501
                                      Garden City, NY 11530
                                      (516) 222-1099

*On the Brief: Matthew W. Brissenden, Esq.*

## PRELIMINARY STATEMENT

In our principal brief, defense counsel advanced a number of arguments attacking both the structure of the Indictment, and the legal theories upon which it was premised.  In particular, we focused upon those aspects of the Indictment that seek to hold Edward Mangano accountable for decisions made in the Town of Oyster Bay, given the fact that Mr. Mangano took no official action with respect to those decisions, and is neither an agent nor a fiduciary of the Town.

Accordingly, we argued: (1) that Counts One through Three of the Indictment are fatally duplicitous, in that they allege two separate bribery schemes, involving distinct and separate governmental organizations; (2) that Mangano is improperly charged with Federal Program Bribery in connection with transactions before the Town of Oyster Bay (Counts One and Two), as he is not an agent of the Town; (3) that Count Two improperly charges the Defendants with conduct occurring outside the statute of limitations; (4) that Counts Three and Four should be dismissed to the extent that they charge Mangano with depriving the Town of Oyster Bay of its right to honest services, as no fiduciary relationship exists between Mangano and the Town and, (5) that Counts Three and Four additionally require dismissal, as Mangano could not have undertook "formal Government action" in the Town of Oyster Bay, as required under *McDonnell.*   In addition, Defense counsel has sought a bill of particulars describing the specific *quid pro quo* which the Government will seek to prove at trial, *Brady* materials, and discovery relating to evidence of selective prosecution.

The Government has responded to each of these arguments.   Perhaps unsurprising, prosecutors would rather have this Court ignore the various legal infirmities raised in the Defendant's motion.   Hence, in their response, the Government repeatedly asserts that all of these complex issues should simply be left for the jury to sort out.  The Government is wrong, as

these issues are ripe for determination now, as a matter of law.  While such issues in the abstract may involve mixed questions of fact and law, here the core facts surrounding such issues are not in dispute.  Given the lack of any meaningful factual dispute, all of these issues are properly addressed before the case proceeds to trial.

On the merits, prosecutors assert that there is no duplicity issue, because – they claim – the Government has properly charged an ongoing "stream of benefits" scheme.  The Government likewise asserts that this "stream of benefits" allegation cures any issues as to the statute of limitations.  As set forth in greater detail below, these assertions are simply incorrect.

Prosecutors further argue that it is *irrelevant* whether Mr. Mangano is an agent or fiduciary of the Town, or whether he performed any official action, because, they claim, the Government can always fall back on a theory of secondary liability – *i.e*., that Mangano aided or abetted Venditto in *his* commission of the alleged crimes, or is liable under a *Pinkerton* theory.

The Government's fall-back position here should be seen for what it is: a tacit concession that Mr. Mangano is not principally liable for such offenses, and an effort to perform an end-run around the evidentiary burdens imposed by 18 U.S.C. §§ 666, 1346, and *McDonnell*.  Worse yet, the Government's new position takes an already bewildering indictment and makes it even less comprehensible.

Finally, the Government has refused to provide particulars cataloguing the alleged things of value received by the Defendants, has declined to offer *any* evidence to rebut allegations of selective prosecution, and has made a series of assertions with respect to its *Brady* obligations which are best described as mystifying.  For the reasons set forth herein, the Government's position on these issues is untenable.

**ARGUMENT**

I.     **Edward Mangano Was Not an Agent of the Town of Oyster Bay for**
       **Purposes of Federal Program Bribery (18 U.S.C. § 666 (a)(1)(B) – Counts One, Two)**

On the issue of agency, the Government does not offer so much as a single citation or supporting fact which might justify finding that Mr. Mangano was an agent of the Town of Oyster Bay.  *See* Government Brief at p. 28.  The Indictment does not allege that such an agency relationship exists, and indeed, it appears that the Government may have chosen to merge the Oyster Bay and Nassau County allegations into a single, substantive § 666 count for the express purpose of evading this pleading requirement.[1]

Unable to muster a convincing argument to the contrary, the Government instead seeks to salvage these Counts by positing a new, alternative theory – *i.e.*, even if Mangano was *not* an agent of the Town, he could <u>still</u> be liable under Counts 1 and 2 as John Venditto's co-conspirator, as an aider and abettor, or under a *Pinkerton* theory of liability.  Indeed, the Government seems to be suggesting that there is no meaningful difference as to the various theories of liability.  *See* Govt. Brief at p. 22 ("Mangano's status as either an agent or a fiduciary of the TOB is irrelevant as Mangano conspired with others, aided and abetted the commission of the crimes, and can be found guilty of the substantive counts based on the actions of his co-conspirators under *Pinkerton v. United States*, 328 U.S. 640 [1946].").

The Government is wrong.  To begin with, it is clear that this marks a significant about-face for prosecutors who have, up to this point, alleged that this case is about *Mangano* receiving things of value, in exchange for "official actions" performed by *Mangano* within the Town of

---

[1]     Compare Count 2 – merging *both* Oyster Bay and Nassau County allegations into a single, substantive count, with Counts 4 and 5, dividing up such allegations into two *separate* substantive Counts under an Honest Services Theory.

3

Oyster Bay.  Now, the Government is seeking to fall back on a theory that Mr. Mangano merely assisted others in *their* commission of such an offense.

Such an alternative theory requires the Government to make an entirely different – and quite high – evidentiary showing.[2]  Thus, to the extent that the Government is permitted to proceed under such an alternative theory, it is *essential* that the jury be provided with *robust* instructions emphasizing that Mr. Mangano may *not* be convicted as a principal for transactions occurring within the Town of Oyster Bay.

As a result – contrary to the Government's suggestion – this is not a factual issue that can be merely ignored or left to the jury. Rather, this issue is properly addressed <u>now</u>, prior to trial.

---

[2]     First – with respect to the substantive TOB counts – Mr. Mangano's guilt would *necessarily* be conditioned upon John Venditto's guilt.  Hence, the jury would need to be instructed that it could not reach Mr. Mangano's liability under either a *Pinkerton* or aiding and abetting theory until it had first determined whether Mr. Venditto was guilty as principal.  *See United States v. Bernstein*, 533 F.2d 775, 799 (2d Cir. 1976) ("person cannot be found guilty of aiding and abetting unless a principal whom he has aided and abetted committed the criminal act."); *United States v. Salameh*, 152 F.3d 88, 149 (2d Cir. 1998) (in order to establish *Pinkerton* liability, Government must first prove that crime was in fact committed by another member of the conspiracy).  Second, shifting the focus to secondary liability would require the Government to prove an entirely different type of *mens rea* with respect to both the substantive and conspiracy counts.  The operative question would no longer be – as the Government has long maintained – whether Mangano accepted things of value to intercede on Singh's behalf in the Town's affairs.  Instead, the question would be whether he knew that *Venditto* had entered into such an arrangement, and agreed to assist or abet *Venditto* in *his* receipt of such corrupting benefits.  That is necessarily so, because both conspiracy and aiding and abetting require that co-defendants share an identical specific intent to commit *the same* offense.  *See United States v. Ceballos*, 340 F.3d 115 (2d Cir. 2003) ("Where the conspiracy involves a specific-intent crime, "the government [must] establish beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute."); *United States v. Smith*, 198 F.3d 377 (2d Cir. 1999) ("government must prove that the underlying crime was committed by someone other than the defendant and that the defendant himself . . . acted  . . . with the specific intent of advancing the commission of the underlying crime.").  The Government may not meet this burden by showing that Venditto and Mangano engaged in parallel schemes to obtain things of value from Singh, or that Mangano interceded in Oyster Bay because his wife was being paid.  Rather, the Government would be compelled to prove that Mangano knew of *Venditto's* alleged quid pro quo arrangement, and sought to make *that* arrangement succeed.

*See United States v Sunia*, 643 F.Supp.2d 51, 69-72 (D.C. 2009) (ruling – *pretrial* – that the defendants were not agents of executive branch and could not be prosecuted as such).

## II.     Edward Mangano Was Not a Fiduciary of the Town of Oyster Bay for Purposes of Honest Services Fraud (Counts Three, Four)

The same rationale applies to the issue of fiduciary duty, which is a requisite element of Honest Services Fraud.  Like the agency issue, this question is ripe for review, and constitutes a viable grounds for pre-trial dismissal.  *See United States v. Steffen*, 687 F.3d 1104 (8th Cir. 2012) (district court properly dismissed fraud counts that were based upon the defendant's material omissions, where indictment failed to allege facts from which Court could infer that defendant was subject to a fiduciary duty to disclose).

On this question, (unlike the agency issue), the Government at least offers *some* token rationale for finding a fiduciary duty.  Namely, the Government suggests that a jury might find such a duty because Nassau County sometimes engages in cooperative behavior with the Town of Oyster Bay, because Town residents are also citizens of Nassau County, and because Nassau County provides some services to Town residents.  *See* Govt. Brief at p. 29.  However, the allegations here do not concern any of these areas of inter-governmental cooperation.  Rather, they relate solely to the terms under which the Town permitted a concessionaire to utilize Town property, which the County had no interest in.

A fiduciary relationship is not to be lightly implied; nor does it impose an uncircumscribed, free-floating obligation on the part of the fiduciary.  Rather, the scope of a fiduciary duty is limited to those matters specifically entrusted to the fiduciary's care and discretionary authority.  *See* Restatement (Second) of Torts § 874 cmt. a ("A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of *another upon matters within the scope of the relation*.") (emphasis added); *Press v.*

*Chem. Inv. Servs. Corp.*, 166 F.3d 529, 536 (2d Cir. 1999) ("the fiduciary obligation that arises between a broker and a customer as a matter of New York common law is limited to matters relevant to affairs entrusted to the broker"); *Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002) ("a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only 'to the extent' that he has or exercises the described authority or responsibility.").

Thus, while Mangano may have fiduciary obligations to Town residents in connection with the County services provided to such residents, that obligation does not extend to contractual matters between the Town and third parties, where the County is not a party to such contracts, and has no interest, discretion or control over the properties in question. Accordingly, the Government should be precluded from proceeding under the legally infirm theory that Mr. Mangano owed a fiduciary duty to the Town of Oyster Bay with respect to the Town's Concession agreements.

**III.  The Government May Not Rely on Transactions Outside of the Statute of Limitations to Establish Liability Under 18 U.S.C. § 666 (a)(1)(B) (Count Two)**

Here, we have focused specifically on the statute of limitations applicable to the *substantive* count of 18 U.S.C. § 666, which is not a "continuing offense." As a result, we have argued that the Government should be precluded from arguing or pursuing a theory that the Defendants accepted things of value while intending to be influenced with respect to the 2010 TOB concession amendment.

In the face of ample authority to the contrary, the Government is unable to point to even a *single* case which holds that 18 U.S.C. § 666 is a continuing offense. Instead, the Government primarily urges this Court to ignore the issue as "procedurally barred." *See* Govt. Brief at p. 38. Contrary to the Government's contention, it is well within this Court's authority to address a

statute of limitations issue *before* trial, so as to prevent the jury from convicting the Defendants under a time-barred legal theory. Indeed, as Judge Irizarry held in *United States v. Sampson*, 122 F.Supp.3d 11 (E.D.N.Y. 2015), this is an issue which is properly addressed before trial. *See id*. at 18-22 (finding that § 666 counts were time-barred, and rejecting Government's argument that pre-trial determination of the statute of limitations issue was "premature"); *see also United States v Sunia*, 643 F.Supp.2d 51, 69-72 (D.C. 2009) (addressing statute of limitation issue prior to trial).

In the alternative – and in the absence of any authority to suggest that 18 U.S.C. § 666 is a continuing offense – the Government seeks to distract from the issue by citing to a bevy of cases dealing with *different* statutes. *See* Govt. Brief at 42-44, *citing to United States v. Smith*, 198 F.3d 377 (2d Cir. 2013) (dealing with 18 U.S.C. § 1951); *United States v. Bustamante*, 45 F.3d 933 (5th Cir. 1995) (18 U.S.C. § 201); *United States v. Lobacz*, 2010 W.L. 1330341 (E.D.N.Y. 2010) (18 U.S.C. § 1349); *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017) (18 U.S.C. §§ 1951, 1341 and 1343). Obviously, such authority is not controlling.

Finally, prosecutors suggest that the statute of limitations is a non-issue because the Government has – *as a factual matter* – alleged an ongoing "stream of benefits." *See* Govt. Brief at p. 42. The Government is wrong, because the question of whether a crime is a continuing offense is *not* a factual issue which hinges upon the allegations in the Indictment. Instead, it is a question of statutory interpretation. Where a crime – such as 18 U.S.C. § 666 – is not a continuing offense, the Government may not magically elude the statute of limitations by simply invoking the phrase "stream of benefits."

Indeed, multiple Courts have explicitly rejected this very argument, holding that "a continuing offense is not the same as a scheme or pattern of illegal conduct." *United States v.*

*Jaynes*, 75 F.3d 1493, 1506 (10th Cir. 1996); *see also United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999).  As the *Sunia* court explained:

> the approach advocated by the government "would treat a continuing course of conduct or scheme the same as a continuing offense under" the Supreme Court's ruling in *Toussie v. United States,* 397 U.S. 112, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970), where the Supreme Court held that limitations periods could be extended "only in cases in which Congress explicitly defines an offense as continuing, or in which the crime by its nature is such that Congress must have intended it to be considered continuing".  The government's approach would, in the court's view, have effectively "add[ed] to those factors a third one" by disregarding the statute of limitations "whenever the *charged conduct* [was] continuous in nature," thereby "largely swallow[ing] the second factor of *Toussie* " and "eviscerat[ing] its narrow, selective approach."

*United States v. Sunia*, 643 F.Supp.2d at 70 (internal citations omitted), *citing to United States v. Yashar*, 166 F.3d at 877.

Accordingly, this Court should reach this issue now, and – consistent with the remedy outlined in *Sunia* – preclude the Government from proceeding under a theory that transactions outside of the five-year statute of limitations may form the basis of a conviction under 18 U.S.C. § 666 (a)(1)(B).  *See id.* at p. 72 (dismissing "those portions of the charged offenses that could be construed as seeking a criminal conviction based upon actions allegedly taken by the defendants more than five years prior to the return of the indictment.").

## IV.   The Government Minimizes and Misconstrues the Proscriptions Set Forth in *McDonnell v. United States*

Edward Mangano has further argued that he is not liable under an Honest Services theory for the transactions occurring in the Town of Oyster Bay, because he did not perform any "official act" within the meaning of *United States v. McDonnell*, 136 S.Ct. 2355 (2016).  Indeed, the Government's theory of prosecution here hinges upon the paper-thin allegation that Mangano "advised and pressured" John Venditto to execute the TOB concession amendments.  This theory is problematic for any number of reasons, including the fact that the then newly-elected

Mangano exercised no formal control or authority over long-time incumbent Venditto, and the fact that the Government is simultaneously alleging that Venditto was *independently* motivated to act, in order to ingratiate himself to Singh.  Further complicating the issue is the fact that the 2011 and 2012 concession amendments were never ratified by the Town Board, and consequently, never went into effect.

Consistent with its running theme, the Government contends that all of these *McDonnell* issues are ultimately factual questions that should be sorted out by the jury.  The Government's response, however, also belies a fundamental misunderstanding of its burden under *McDonnell*. In particular, the Government repeatedly suggests that it can meet its burden by merely showing that Mangano accepted things of benefit while intending "to influence other public officials," or to engage in "advocacy" on behalf of Singh.  Govt Brief at pp. 31, 35.  Remarkably, it further cites to *United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990) – a pre-*McDonnell* case – for the proposition that a "public official acts corruptly by making introductions and aiding in securing favorable action from other officials…"  Govt. Brief at p. 36.

In this regard, the Government spells out – for the first time – precisely the offending conduct which it hopes to prove at trial.  Namely, the Government contends that in 2010, Singh raised his concern about the TOB concession amendment with Mangano, and that Mangano "spoke to Venditto about the TOB guaranteeing these loans.   During these conversations Mangano assured Singh 'it will get done.'"  Govt. Brief at p. 8.   Sometime thereafter, the Government notes, Mangano's former law firm, Rivkin Radler, became involved in counseling the Town with respect to the 2010 concession amendment.  Govt. Brief at p. 8-9.   The Government alleges that Mr. Mangano subsequently attended a meeting with Venditto, the

attorneys and others, at which he stated "let's find a way to help our friend."  Govt. Brief at p. 54-55.[3]

Based on the arguments advanced, it is clear that the Government has not taken the central tenant of *McDonnell* to heart – namely, that generalized advocacy is not synonymous with "pressure."  *See McDonnell*, 136 S.Ct. at 2371 ("Simply expressing support . . . at a meeting, event, or call . . . does not qualify as a decision or action . . . so long as public official does not intend to exert pressure . . .").  As the Court warned, "conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time."  Indeed, "[t]he basic compact underlying representative government assumes that public officials will were hear from their constituents and act appropriately on their concerns . . ." *Id*. at 2372.

Recent District Court cases applying *McDonnell* highlight this point.  Hence, in *United States v. Jefferson*, 2017 WL 4423258 (E.D.Va. Oct. 4, 2017), the District Court had occasion to reconsider the conviction of a congressman convicted of bribery and honest services fraud.[4]  Among other things, the Court considered evidence that the congressman had taken money from a company called iGate, and thereafter attended meetings with military personnel in which he promoted the company and its products.  The District Court, however, found that such generalized advocacy could not legally constitute pressure, where there was no indication that

_____

[3]     As the Court is aware, on November 21, 2017, the Securities and Exchange Commission filed a civil complaint against the Town of Oyster Bay and Venditto alleging securities fraud with regard to the Town of Oyster Bay Concession Agreement amendments which are the subject of Counts One – Four of this indictment.  The detailed 48 page complaint adds no new facts with regard to Mangano's purported role in the Concession Agreement amendments other than those cited by the Government in their instant opposition.

[4]     The motion to vacate was brought before the District Court by way of a § 2255 Petition, in light of the *McDonnell* decision.

the congressman *ordered* or otherwise sought to coerce the military officials.   As the Court explained:

> The evidence presented at trial does not support a finding that Jefferson took "official acts" with respect to his meetings with either General Hylton or Colonel Brown. Jefferson met with General Hylton and Vernon Jackson in his congressional office to discuss possible testing of iGate technology at Fort Huachuca. At that meeting, Jefferson made several encouraging statements about iGate's technology, and General Hylton described the process by which the Army admits products to be tested. It is true, as the government argues, that whether to admit iGate technology for testing might qualify as a "pending matter." *Id.* at 2370. But, as the Supreme Court explained, "[s]etting up a meeting, [or] talking to another official...—without more—does not fit th[e] definition of 'official act.' " *Id.* at 2359. There is no indication that Jefferson pressured General Hylton to admit iGate technology for testing; in fact, General Hylton's own testimony at trial was that Jefferson never ordered him to test iGate products.

*Id*. at *14.

The Court went on to consider whether the congressman had committed an "official act" by writing to the State Department, using his congressional letterhead, in order to support a visa application made by one of iGate's prospective business partners.   Again, the Court ruled that as a matter of law, this was not enough to constitute pressure:

> The two-step *McDonnell* analysis applied here makes clear that whether to issue a travel visa to Kachikwu was a matter or question pending before U.S. embassy officials. The decision of whether to grant a visa is "a determination before an agency" and thus has sufficient concreteness and formality to qualify as an official act. *Id.* at 2370. The important second question is whether Jefferson used his "official position to exert pressure on" State Department officials "to perform an 'official act.' " *Id.* at 2359. The trial evidence shows that Jefferson wrote a letter on congressional letterhead in support of Kachikwu's visa application and made a phone call to individuals at the London embassy. The assistance with visa applications was not a significant focus of the trial, and so it is not clear what was said in these letters or the phone call. Based on the available evidence, there is no indication that Jefferson exerted pressure as required to make his actions official; instead, it appears that Jefferson was, as was true in *McDonnell*, "[s]imply expressing support" for Kachikwu's visa application. *Id.* at 2371. That expression of support is not criminal under *McDonnell*, and therefore Jefferson's actions in support of Kachikwu's visa application could not support criminal liability.

*Id*. at *16.

11

Finally, prosecutors focused on promises of assistance made by the defendant to the putative bribe payers.  In particular, the trial evidence established that the defendant told his beneficiaries that he would assist in obtaining financing from the United States Export–Import Bank, and would "make sure" that the bank approved a proposed joint venture between iGate and another company.  Notably, as in this case, prosecutors argued that under *McDonnell* it was sufficient to show that the defendant *agreed* to perform an official act in exchange for value, regardless of whether such act was actually undertaken.  *Id*. at *16-*17; *see also* Government Brief at p. 37.

While the District Court acknowledged the legal principal, it went on to hold that the trial evidence was insufficient to show such an agreement, where the defendant had made only generalized promises to assist, and had not explicitly agreed to *pressure* bank officials.  As the Court explained in relation to the financing:

> Although an agreement to accept money in exchange for a promise to exert pressure on a public official to take a future official act could well support a finding of criminal bribery, it does not do so on the evidence presented in this case. Jefferson agreed to assist NDTV with obtaining Ex–Im Bank financing, but testimony at trial does not clarify what Jefferson meant by "assistance." There is no evidence that Jefferson agreed to "exert pressure" on public officials as required in *McDonnell*, even if it was implied that his role as a Congressman would assist in the effort. *Id.* Ultimately, Jefferson's actions with respect to the Ex–Im Bank and NDTV amounted to nothing more than making introductions and expressing support, both of which are not criminal under *McDonnell*.

*Id*. at *16.

Similarly, with respect to the joint venture, the Court ruled:

> [A]gain the government's argument fails for the same reasons it did for NDTV. The trial evidence shows that Jefferson said he would "make sure" W2's Ex–Im Bank application "got approved."(JA 1935–36; 1941–45; 5438–42). What the trial evidence does not make clear is how Jefferson intended to "make sure" that approval would be forthcoming from Ex–Im Bank officials. There is no evidence that Jefferson agreed to exert pressure on Bank officials, and that lack of

12

specificity might mean that Jefferson intended only to assist W2 by showing support and arranging meetings as he had done with NDTV. And as in the NDTV endeavor, Jefferson's only actions to help W2 were arranging a July 15, 2005 meeting between Mody and Ex–Im Bank officials and expressing support for the iGate-W2 venture at that meeting. Mody recorded the meeting in anticipation of supporting the government's case against Jefferson, but Jefferson's statements on the tape amount to little more than support for the venture. Such expressions of support are not official acts under *McDonnell*.

*Id.* at *17.

As the *Jefferson* case makes clear, *McDonnell* is not the toothless paper tiger which the Government makes it out to be, and the word "pressure" is not to be treated as a synonym for "support," "advocate" or "encourage."   Rather, the Government is obligated to show that Mangano sought to use his official position to force or coerce another official into taking action. Likewise, merely assuring Singh that the concession issue would be resolved is not an agreement to pressure.

 Based upon the arguments articulated in our principal brief, we respectfully submit that the indictment fails to sufficiently allege that Edward Mangano took *any* official action with respect to the TOB concession agreements.

**V.     The Government's Stream of Benefits Theory Does Not Justify the Indictment's Rampant Duplicity**

As with the statute of limitations issue, the Government leans heavily upon a "stream of benefits" theory to justify the rampant duplicity which plagues its Indictment.  *See* Govt. Brief at p. 47 ("the defendants' argument fails because the Indictment sufficiently alleged that the defendants agreed to participate in a stream of benefits conspiracy with Co-Conspirator #1.") This argument *might* hold water if the Defendant's were arguing that each separate payment represented a distinct offense.  However, that is not the argument we have advanced.

13

Instead, we have argued that the Indictment describes two parallel bribery schemes – the first of which was allegedly aimed at securing favorable concession agreements from the Town of Oyster Bay, and the second of which was aimed at obtaining food contracts from Nassau County.  The Government contends that the first scheme involved Harendra Singh, John Venditto, and Edward Mangano, while the second scheme *only* involves Messrs. Singh and Mangano.  It does not allege that the success of the second alleged scheme was in any way dependent upon, or interrelated to the success of the first.

Despite Venditto's utter absence from the latter scheme, the Government has seen fit to charge both schemes under a single count in three separate places – Counts 1, 2, and 3 of the Indictment.  Hence, Count 1 charges a unitary conspiracy to violate 18 U.S.C. § 666 (a)(1)(B); Count 2 merges both schemes into a single, substantive bribery count under 18 U.S.C. 66(a)(1)(B); and Count 3 charges a unitary Honest Services Conspiracy.  This, despite the fact that the alleged schemes occurred at different times, affected different Governmental entities, involved different Defendants, and operated independent of one another.

As we have argued, such duplicity is most glaring with respect to Count 2, because the statute specifically defines the substantive offense in relation to the governmental organization which was the target of the purported bribery.  For each substantive Count of 18 U.S.C. § 666, the Government is obligated to prove: (1) that the named defendant was an agent of a *specific* governmental organization, (2) that such organization received federal benefits in excess of $10,000 per year; (3) that defendant/agent corruptly solicited or received something of value; (4) for the purpose of influencing transactions pending before such organization; (5) having a value of $5,000 or more.  Hence, the unit of prosecution under § 666 is inherently tied to the number of qualifying governmental organizations which were affected.

14

Indeed, the First Circuit Court of Appeals reached this precise conclusion in *United States v. Newell*, 658 F.3d 1 (1ˢᵗ Cir. 2011).  In that case, the defendant had been charged with embezzling funds from multiple, different governmental organizations in violation of 18 U.S.C. § 666(a)(1)(A).  The Government, however, aggregated his various acts of misappropriation from different organizations under a single count.  The Court of Appeals held that the indictment was impermissibly duplicitous, because "misapplying funds from Agency A in March and misapplying funds from agency B in July" constituted two distinct offenses.  *Id*. at 26.  The same result is dictated here.

Although the duplicity issue is most obvious in Count 2, the conspiracy counts of Count 1 and 3 fair no better.  While it is true that a single conspiracy may have multiple criminal objectives, it remains the case that two *different* agreements may not be charged under a single conspiracy count.  *See United States v. Abakporo*, 959 F.Supp.2d 382, 390-391 (S.D.N.Y. 2013) (finding conspiracy count to be duplicitous where two separate conspiracies were charged in single count, requiring pretrial reformulation of indictment).

 "The gist of the crime of conspiracy as defined by the statute is the agreement to commit one or more unlawful acts, from which it follows that the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects.  A single agreement to commit several crimes constitutes one conspiracy.  *By the same reasoning, multiple agreements to commit separate crimes constitute multiple conspiracies*." *United States v. Broce*, 488 U.S. 563, 570–71, 109 S. Ct. 757, 763, 102 L. Ed. 2d 927 (1989) (internal citations omitted) (emphasis added).

Accordingly, the Second Circuit has repeatedly emphasized that it is *not* sufficient for the Government to merely show that two distinct agreements are linked by common participants.

*See United States v. Bertolotti*, 529 F.2d 149, 155 (2d Cir. 1975) ("the only common factor linking the transactions was the presence of Rossi and Corralusso.  This type of nexus has never been held to be sufficient."); *see also United States v. Borders*, 829 F.3d 558, 564 (8th Cir. 2016) ("A single conspiracy requires one overall agreement.  It is not proved by a mere overlap of personnel or knowledge of another's illegal conduct.").  Indeed, over seventy years ago the Court of Appeals warned:

> It is true that at times courts have spoken as though, if A. makes a criminal agreement with B., he becomes a party to any conspiracy into which B. may enter, or may have entered, with third persons. That is of course an error: the scope of the agreement actually made always measures the conspiracy, and the fact that B. engages in a conspiracy with others is as irrelevant as that he engages in any other crime. It is true that a party to a conspiracy need not know the identity, or even the number, of his confederates; when he embarks upon a criminal venture of indefinite outline, he takes his chances as to its content and membership, so be it that they fall within the common purposes as he understands them. Nevertheless, he must be aware of those purposes, must accept them and their implications, if he is to be charged with what others may do in execution of them.
>
> *United States v. Andolschek*, 142 F.2d 503, 507 (2d Cir. 1944).

Over and above awareness, a criminal conspirator must possess the *specific intent* to effectuate the substantive offense which is the subject of the purported agreement.  *United States v. Anderson*, 747 F.3d 51, 61 (2d Cir. 2014) ("Critically, in order to prove conspiracy, the government must demonstrate that the defendant possessed the specific intent to commit the offenses that were its objects.  This requires the Government to prove at least the degree of criminal intent necessary for the substantive offense itself.").

Here, the Indictment does not allege – *on its face* – that Venditto participated in, or even was aware of, Singh's efforts to obtain Nassau County food contracts.  Indeed, in failing to charge Venditto in Count 5, the Government tacitly acknowledges that he had nothing to do with such transactions.  In the absence of any such knowledge, it is crystal clear that Mr. Venditto

16

could not have possessed the requisite specific intent to influence such matters, or to enter into such an agreement with Singh and/or Mangano.

Nor is it sufficient for the Government to merely allege that Venditto had a parallel intent to accept bribes, or be influenced with respect to the Town of Oyster Bay. By way of analogy, if A, B and C conspire to murder victim X, and if A and B then subsequently murder victim Y on their own, C's specific intent with respect to victim X does not make him liable for conspiracy to murder Y. *See United States v. Gonzalez*, 786 F.3d 714 (9th Cir. 2015) (in prosecution for conspiracy to murder rival gang members, jury must unanimously agree on the person or persons who were intended victims of murder conspiracy).

The bottom line is that this Indictment – on its face – describes two distinct bribery schemes, linked by a common bribe payer. Such allegations are not enough to create a single conspiracy. *See United States v. Sutherland*, 656 F.2d 1181 (5th Cir. 1981) (Government failed to charge single conspiracy, where it alleged that two different attorneys bribed common judge).

**VI.    The Government's Newly Articulated Reliance Upon Secondary Liability Aggravates the Duplicity Problems Plaguing Counts One Through Three of the <u>Indictment and Requires Reformulation or Dismissal of Such Counts</u>**

Likewise, the Government's new focus on secondary liability does nothing to salvage the duplicitous nature of Counts 1 through 3. To the contrary, it significantly aggravates those issues. In particular, the Government's new focus on secondary liability takes this already bewildering Indictment and makes it even *less* comprehensible.

Consider, for example, the Government's new embrace of *Pinkerton* liability. According to the Government, because there is a single, unitary bribery scheme, the Defendants are liable for any substantive crimes undertaken in furtherance of the scheme. Although the Government focuses – for the purposes of their motion – on Mangano's liability for the Oyster Bay

concession agreements, such logic would apply equally to Venditto. Thus, under the Government's *Pinkerton* theory, Venditto would be criminally liable for Mangano's conduct in awarding Nassau County food contracts – despite his complete lack of involvement. Moreover, because Venditto is expressly charged with such conduct in Count 2, there is nothing preventing a jury from convicting him of *substantive* program bribe receiving, based solely upon Mangano's alleged receipt of benefits in connection with such Nassau County transactions.

Although such an outcome would flow naturally from the Government's reasoning, prosecutors do not articulate this possibility, because the absurdity of such a result only serves to highlight the duplicitous nature of the Indictment. Indeed, it would be grotesque to suggest that Venditto is liable for the Nassau County contracts under a *Pinkerton* theory, precisely because such transactions are completely outside of the scope of the conspiracy he is alleged to have entered. This confirms at a gut level that which should already be obvious – Counts 1, 2 and 3 merge together two separate, and utterly distinct offenses.

The Government suggests that to the extent that there is a duplicity problem, it can be cured *either* by reformulation of the Indictment, or jury instructions requiring unanimity. Govt. Brief at p. 46-47. While we agree that reformulation may be a proper remedy, we emphatically *disagree* that the duplicity problem can adequately be addressed by mere jury instructions. That is because for each duplicitous count, there would be multiple means of convicting each Defendant, each of which would require a different standard of proof.

With this, considering Count 2 alone – if left as charged, the jury would need to be presented with the following, dizzying array of options:

1)      The jury could convict John Venditto based upon evidence that he was an agent of the Town of Oyster Bay, that Oyster Bay received over $10,000 per year in federal funds, that Mr. Venditto received things of value with an intent to be rewarded or influenced with respect to the 2010 concession amendment, and that such amendment was worth more than $5,000.

2)      The jury could convict John Venditto based upon evidence that he was an agent of the Town of Oyster Bay, that Oyster Bay received over $10,000 per year in federal funds, and that Mr. Venditto received things of value with an intent to be rewarded or influenced with respect to the May, 2011 concession amendment, and that such amendment was worth more than $5,000.[5]

3)      The jury could convict John Venditto based upon evidence that he was an agent of the Town of Oyster Bay, that Oyster Bay received over $10,000 per year in federal funds, and that Mr. Venditto received things of value with an intent to be rewarded or influenced with respect to the November, 2011 concession amendment, and that such amendment was worth more than $5,000.

4)      The jury could convict John Venditto based upon evidence that he was an agent of the Town of Oyster Bay, that Oyster Bay received over $10,000 per year in federal funds, and that Mr. Venditto received things of value with an intent to be rewarded or influenced with respect to the 2012 concession amendment, and that such amendment was worth more than $5,000.

5)      The jury could convict Edward Mangano with respect to the 2010 TOB concession amendments, *but not as a principal*, because Mr. Mangano is not an agent of the TOB.[6]  Instead, the jury would need to find *either* that he aided or abetted Mr. Venditto, or that he is liable under a *Pinkerton* theory.  As such, the Government would be required to prove either:

a) (i) that John Venditto committed substantive program bribery in connection with the 2010 concession amendments; (ii) that Edward Mangano was aware that Mr. Venditto was receiving things of value from Singh with the specific intent to be rewarded or influenced in connection with that concession amendment; and (iii) that Edward Mangano undertook some affirmative action to assist Mr. Venditto in his receipt of such things of value, thereby aiding and abetting the offense.

-or-

---

[5]      The Government is likely to respond with its oft-repeated mantra, that all four concession amendments are part of a single, ongoing course of conduct.  However, as explained in our principal brief, the circumstances surrounding the varying concession agreements are extremely different, and there is a strong evidentiary defense that neither Mangano nor Venditto had anything to do with the "rogue Fred Mei amendments."  In light of the varying evidence, the jury could very well find that the Defendants were privy to the circumstances surrounding the 2010 amendment, but not the 2011 and 2012 amendments.

[6]      *See* Point I, Supra.

b) (i) that Edward Mangano entered into an illicit agreement with John Venditto, which specifically contemplated Venditto's receipt of things of value from Singh, for the purposes of rewarding or influencing Venditto in connection with matters pending before the Town of Oyster Bay, (ii) that John Venditto committed substantive program bribery in connection with the 2010 concession amendments; and (vi) that Venditto's commission of that substantive offense was reasonably foreseeable to Edward Mangano.

6)      Likewise, the jury could convict Edward Mangano with respect to the May, 2011 TOB concession amendments either (a) as an aider and abettor or (b) under a *Pinkerton* theory, but only if it *first* found that John Venditto committed the substantive offense, as described above.

7)      The jury could convict Edward Mangano with respect to the November, 2011 TOB concession amendments either (a) as an aider and abettor or (b) under a *Pinkerton* theory, but only if it *first* found that John Venditto committed the substantive offense, as described above.

8)      The jury could convict Edward Mangano with respect to the 2012 TOB concession amendments either (a) as an aider and abettor or (b) under a *Pinkerton* theory, but only if it *first* found that John Venditto committed the substantive offense, as described above.

9)      The jury could convict Edward Mangano based upon evidence that he was an agent of Nassau County, that Nassau County received over $10,000 per year in federal funds, that Mr. Mangano received things of value with an intent to be rewarded or influenced with respect to the June 2012 Nassau bread contract, and that such contract was worth more than $5,000.

10)     The jury could convict Edward Mangano based upon evidence that he was an agent of Nassau County, that Nassau County received over $10,000 per year in federal funds, that Mr. Mangano received things of value with an intent to be rewarded or influenced with respect to the November 2012 emergency procurement order, and that such order was worth more than $5,000.

11)     The jury could convict John Venditto with respect to the June 2012 bread contract, either (a) as an aider and abettor or (b) under a *Pinkerton* theory, but only if it *first* found that Edward Mangano committed the substantive offense, as described above.

12)     The jury could convict John Venditto with respect to the November 2012 emergency procurement order, either (a) as an aider and abettor or (b) under a *Pinkerton* theory, but only if it *first* found that Edward Mangano committed the substantive offense, as described above.

The bewildering number of permutations with respect to this *single* count, and the varying standards applicable to the different theories of liability, all but assure juror confusion, with the attendant likelihood of inconsistent or non-unanimous verdicts.

Instead, this Court should require the Government to cure its duplicitous Indictment by choosing a single offense to prosecute for each count.  *See United States v. Kearney*, 451 F.Supp. 33, 38 (S.D.N.Y. 1978) ("it has been held that the appropriate remedy for a duplicitous count is to require the government to elect one of the multiple offenses embraced therein on which to proceed.").  Hence, Count 1 should charge a bribery conspiracy with respect to *either* the Town of Oyster Bay or Nassau County; Count 2 should charge substantive bribe receiving with respect to *either* Oyster Bay or Nassau County; and Count 3 should charge an honest services conspiracy with respect to *either* Oyster Bay or Nassau County.  Notably, such reformulation would go a long way to assuring a unanimous verdict, without in any way prejudicing the Government in its presentation of the case.

## VII.   The Government Should Be Compelled to Produce a Bill of Particulars and *Brady* Materials Well in Advance of Trial

As of the date of this filing, Mr. Mangano is still uncertain as to the specific contours of the *quid pro quo* which is being alleged by the Government.  The Government's opposition brief does nothing to quell this concern.  Quite to the contrary, prosecutors repeatedly assert that the Indictment is not a definitive statement of their case, but merely sets forth "examples" of the conduct which they intend to prove at trial.  *See* Govt. Brief at pp. 8, 10, 34.  The problem is exacerbated by the incredible breadth of 18 U.S.C. § 666, which allows prosecutors to meet their burden by showing that the Defendants received literally "*anything* of value," regardless of its *de minimis* nature.  And indeed, it is clear that prosecutors fully intend to take advantage of the

21

statute's flexibility, as they have warned: "the Government's theory is that *everything* of value received by the defendants from Co-Conspirator was in furtherance of the bribery and honest services scheme."  Govt. Brief at p. 95 (emphasis added).

Thus, this case is unlike *United States v. Hunter*, No. 3:06CR237 JBA, 2006 WL 3334607, at *3 (D. Conn. Nov. 16, 2006), which the Government cites in its brief.  *See* Govt. Brief at p. 93-94.  In *Hunter*, the defendant was accused of embezzling cash from a federally funded program, and the unlawful withdrawals were specifically identified as checks cashed by the defendant at two specific locations.

By way of contrast, the Government has made clear that the "things of value" in *this* case include numerous *de minimis* items, including unspecified meals, car rides, and gifts allegedly bestowed upon the Defendants.  Moreover, this is not a case where the Government's voluminous production of documents provides the requisite clarity. *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) ("The Government did not fulfill its obligations merely by providing mountains of documents to defense counsel . . .").  That is particularly true where Harendra Singh will presumably testify that the Defendants enjoyed car rides, meals and other miscellaneous perks for which there are no financial records.

While such ambiguity no doubt serves the Government's strategic ends, it cannot be squared with the admonition that Courts should avoid "trial by ambush."  *United States v. Kelly*, 420 F.2d 26, 29 (2d Cir. 1969).  Among other things, the Defendants should be presented with a fair opportunity to review their own financial records in order to adduce evidence that they paid for specific meals or benefits allegedly bestowed upon them – a time consuming undertaking, which will likely be impossible in the heated melee of trial.  As a result, under similar circumstances, courts have repeatedly ordered the Government to provide particulars detailing

the alleged payment of bribes.   *See United States v. Lino*, No. 00 CR. 632 (WHP), 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001) (ordering Government to produce particulars with respect to alleged bribes);   *United States v. McGuinness,* 764 F.Supp. 888, 893–94 (S.D.N.Y.1991) (granting bill of particulars in action involving unlawful payments as to amount and date of each payment and who made the payment); *United States v. McCarthy,* 292 F.Supp. 937, 941 (S.D.N.Y. 1968) (granting bill of particulars as to nature of alleged bribes).

Likewise, the Government's evasive response to the Defendants' request for *Brady* material is equally troubling.  Notably, the Government does not deny that it is in possession of such material, nor does it propose a schedule for the production of such materials.  Even worse, the Government's position as to what constitutes "exculpatory material" appears to border, at times, on the willfully obtuse.

Defense counsel has, repeatedly and in great detail, laid out its theory of the defense with respect to the 2011 and 2012 Fred Mei amendments; namely, that such amendments were undertaken *unilaterally* by Fred Mei in exchange for bribes from Singh, without Edward Mangano's approval or knowledge.   Accordingly, we have asked the Government for any evidence or information which would support this defense.

In their response, Prosecutors do not deny having such information, but argue that it is not exculpatory, because, they assert, "[c]onduct taken by co-conspirators in furtherance of the conspiracy that the defendants are a part of does not constitute Brady material."  Govt. Brief at p. 100, 101.  Such reasoning is conclusory and mind-numbing in its circularity.  Indeed, the very point here is that the Defendant is entitled to such information because it would tend to show that such concession amendments *were not* undertaken pursuant to an agreement with Mangano, and were *not* in furtherance of any conspiracy to which he was a party.

Likewise, the Government acknowledges that the Defendant has asked for information concerning any employee of either the Town of Oyster Bay or Nassau County who has told investigators that they were *not* "pressured" by Mangano and/or Venditto. Again, prosecutors do not deny having such information, but they assert – without *any* explanation whatsoever – that it does not constitute *Brady* material. Govt. Brief at p. 100. The prosecution's position here is *beyond* troubling, because it suggests a blithe willingness to hide the existence of witnesses who would undercut the very core of the Government's case – *i.e.*, that Mangano was placed on "retainer" to influence governmental decisions on an "as needed basis."

In short, the Government's cagey response to the Defendant's request for a bill of particulars and *Brady* material – far from providing reassurance – highlights instead the need for a Court order mandating the disclosure of such materials as soon as possible.

## VIII.  The Government Has Failed To Respond In a Meaningful Way to Non-Frivolous Allegations of Selective Prosecution

Contrary to the Government's repeated assertion, the Defendant's selective prosecution argument is not based on "nothing." Rather, it is based on a sworn affidavit – which is far more than the Government has seen fit to produce. Such <u>evidence</u> establishes that a prominent figure within the Nassau County Democratic establishment has stated that high-ranking members of that organization worked to secure Mr. Mangano's indictment in the run-up to the election. In fact, as of the date of this writing, federal investigators have interviewed Mr. Muscarella on at least two occasions, during which he repeated his core account.

Given these rather troubling, sworn allegations, one would think that the Government would respond with *some* modicum of its own evidence to establish that such allegations are unfounded. Indeed, if prosecutors are to be believed, the Government could have easily supplied

this Court with affidavits from Messrs. McDonald and Jacobs refuting this allegation.  However, for whatever reason, it has chosen not to do so.  Instead of evidence or information, it has provided this Court with nothing more than heated rhetoric in opposition.

At a bare minimum, the Government *could have* provided assurances to this Court that it has surveyed the prosecution team and all of its members, has determined that such attorneys had no contact with persons affiliated with the Democratic party relating to this case, and that no outside influence or pressure was brought to bear.  Again, it has chosen not to do so.   Likewise, they could have put forward some explanation or justification as to the timing of this Indictment, coming as it did in the immediate run-up to the election, after a protracted investigation.  But, for whatever reason, they have chosen not to do so.

Instead, the Government argues that even *if* Muscarella's affidavit is fully true, it fails to establish what, if any, contact *actually* transpired with members of the prosecution team.  In this regard, it appears that the Government is suggesting that it is the Defendant's obligation to come forward with an affidavit from *either* Mr. Jacobs, Mr. Clinton, or a DOJ employee, confessing to what would probably amount to a violation of the Hatch Act.  This, of course, is an utterly impossible burden, and is *not* the applicable standard to obtain discovery.  Rather, the question is whether the Defendant has set forth "*some evidence* tending to show the existence of the essential elements of a selective prosecution claim."  *United States v. Armstrong*, 517 U.S. 456, 470 (1996) (emphasis added).   The Defendant has unquestionably met this burden.

Given the troubling nature of the evidence which is before the Court, the public's interest in assuring the integrity of our criminal justice system, and the Government's failure to provide *any* meaningful response to these sworn allegations, we would respectfully ask the Court to enter an order mandating appropriate discovery as to this issue.

**IX.**     **The Court Should Sever the Trials of Messrs. Mangano and Venditto**

As we previously pointed out, courts have *repeatedly* found that, where an indictment outlines multiple, distinct conspiracies, one of which involves all defendants, but others which do not, joinder is improper.  *See* Mangano's Principal Brief, *citing United States v. Rajaratnam*, 753 F.Supp.2d 299, 308 (S.D.N.Y. 2010) ("numerous courts in this district have held that charging one defendant in two conspiracy counts does not render the counts properly joined where only one of the counts charges a second defendant."); *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978); *United States v. Lech*, 161 F.R.D. 255, 256 (S.D.N.Y. 1995) ("[i]t is well settled that . . . two separate transactions do not constitute a 'series' within the meaning of Rule 8(b) merely because they are of a similar character or involve one or more common participants." )*; United States v. Gentile,* 60 F.R.D 686 (S.D.N.Y. 1973) (distinct and separate bribery schemes not properly joined, despite similar nature of offenses and common participants); *United States v. Giraldo*, 859 F.Supp. 52 (E.D.N.Y. 1994) (joinder of defendants was improper where indictment charged two separate conspiracies, the second of which involved only one of the charged defendants); *United States v. Menashe*, 741 F.Supp. 1135 (S.D.N.Y. 1990) (same); *see also United States v. Kouzmine*, 921 F. Supp. 1131, 1133 (S.D.N.Y. 1996) ("cases in this circuit have concluded that the joinder of distinct conspiracies . . . is improper.").

Based on this authority, we previously argued that joinder was improper because the original indictment combined two distinct schemes, the latter of which did not involve John Venditto.

The Superseding Indictment has now *further* compounded this problem, by adding yet a *third* alleged scheme to the mix – *i.e.*, a scheme to defraud investors who purchased Oyster Bay's municipal bonds – in which Mr. Mangano is not charged.   Hence, the new Indictment

charges *only* Venditto with securities fraud, a separate conspiracy to commit wire fraud, and *nineteen* additional substantive counts of wire fraud.   None of these allegations, or the voluminous evidence which will be adduced at trial, has anything whatsoever to do with Mr. Mangano.

It is clear that the new scheme and conspiracy described in the Superseding Indictment was animated by a goal and purpose entirely distinct from those described in Counts 1-6.   While the initial charges relate to purported efforts to secure things of value from Harendra Singh, the new allegations involve efforts by John Venditto only to deceive municipal investors as to the Town's finances.   There is no allegation that Mr. Mangano was even aware of such conduct, much less that he participated in it.

Under these circumstances, Courts have held that severance is mandated, even where the two conspiracies share common participants.   For example, in *United States v. Greenfield*, 2001 W.L 1230538 (S.D.N.Y.), the District Court had occasion to consider an indictment which joined together two distinct conspiracies. Count 1 alleged that defendants Greenfield, Waldman, Weinberger, and Roth conspired to obtain insurance policies on two properties in order to submit false and inflated claims for water damage.   Count 2 alleged that the defendants Greenfield, Waldman, and Weinberger (but not Roth) advised and assisted a confidential informant in the submission of a false renter's insurance claim for stolen furniture.   As the Court held, in the absence of a common unifying purpose, the mere overlap in defendants was not sufficient to establish proper joinder:

> In the instant action, the Indictment does not allege a common goal or purpose. The goal or purpose of the conspiracy alleged in Count One of the Indictment was to obtain money for Greenfield by submitting false insurance claims for water damage . . . The goal or purpose the conspiracy alleged in Count Two of the Indictment was to obtain money for the Government's confidential informant by submitting a false insurance claim for burglary. . .These allegations . . . are like

27

those in *Lech* and *Kouzmine,* in which there was some overlap among the alleged conspiracies, but no unifying purpose. The Indictment does not allege that Roth shared the goal of the Count Two conspiracy; it does not even allege that Roth knew of that conspiracy or its goal . . . Severance is in order if there was no shared goal or purpose among the alleged conspiracies.

*Id.* at *3.

The same result is dictated here, where the Superseding Indictment has added an entirely new conspiracy, which does not share a common goal or purpose with the purported schemes described in the original Indictment, and which has *nothing* to do with the Mangano's.

Indeed, it is clear that Edward and Linda Mangano would be subject to significant spill-over prejudice at any joint trial on the Superseding Indictment, where the Government is likely to adduce voluminous evidence concerning the harm to Oyster Bay's bondholders – evidence that would *not* be admissible at a separate trial.

Moreover, the Government's strategic decision to add these previously available charges at the last possible minute significantly undercuts any argument that a joint trial is necessary for the purposes of judicial economy.  At this point, the *only* evidence that pertains to *both* Mangano *and* Venditto is that which relates to the Oyster Bay transactions – several days of testimony in a trial which is currently anticipated to last for *eight* weeks.  The balance of those eight weeks will mostly be spent dealing with the Nassau County transactions (which have nothing to do with Venditto), or the *twenty-one* counts of securities and wire fraud, which have nothing to do with Mangano.  Hence, there is very little to be gained, efficiency-wise, by trying the Defendants together in one, massive, eight-week trial, as opposed to two, more manageable, four-week trials.[7]

---

[7]    Certainly, shorter, separate trials would make it significantly easier to seat a jury.

Finally, at any joint trial, counsel for Mangano will be compelled to defend against charges that he "pressured" Venditto with respect to the Oyster Bay concession amendments, by arguing that Venditto was ready, willing and able to assist Singh, without any intervention on the part on Mangano.  In furtherance of this argument, counsel anticipates adducing evidence that, well before Mangano was even elected, the Town *repeatedly* entered into concession agreements which benefitted Singh's businesses, and that Venditto *repeatedly* endorsed amendments to such agreements that were favorable to Singh.  Likewise, to the extent that there are benefits flowing to Venditto which predate Mangano's election, it is in Mangano's interest to focus the jury on such benefits, in order to establish the strong pre-existing relationship between Singh and Venditto.  As a result, a joint trial raises the ugly prospect of cross-incrimination, with defense counsel effectively serving as a "second prosecutor".  *See Zafiro v. United States*, 506 U.S. 534, 544, 113 S. Ct. 933, 940 (1993) ("joinder may introduce what is in effect a second prosecutor into a case, by turning each codefendant into the other's most forceful adversary."); *United States v. Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. 2017) (severance granted where Court was concerned that co-defendant's counsel would effectively become second prosecutor.)

Accordingly, we respectfully submit that, in the wake of the Superseding Indictment, severance is more appropriate and necessary than ever, under *both* F.R.C.P. Rules 8 and 14.

## **CONCLUSION**

Based upon the foregoing arguments, as well as those set forth in our principal brief, we are respectfully asking this Court to grant, in full, the relief sought in the Defendant's motion papers.  Counsel for Edward Mangano further joins in the arguments made by counsel for John Venditto and Linda Mangano, to the extent that such arguments are applicable to Mr. Mangano.

Dated: Garden City, New York
         December 11, 2017

                                        Respectfully submitted,

                              By:    /s/  Kevin J. Keating
                                     Kevin J. Keating, Esq.
                                     *Counsel for Edward Mangano*
                                     666 Old Country Road, Suite 501
                                     Garden City, NY 11530
                                     (516) 222-1099

*On the Brief: Matthew W. Brissenden, Esq.*